Bartley, J.
The errors assigned are substantially as follows:
I. That the court erred in sustaining the demurrer to the plea.
II. That the. court erred in pronouncing judgment without a plea of guilty, or a finding of a jury.
III. That the indictment was insufficient.
The first and most prominent question presented in the case is that of the sufficiency of the ground of defense set up in the special plea.
The question of the validity of the act to restrain the sale of spirituous liquors, passed March 12, 1851, is not raised; but the inquiry is presented, whether the effect and operation of the act was to revoke or annul the authority to retail spirituous liquors granted to tavern-keepers by licenses which had not expired when the act took effect.
The right to keep a tavern or to retail spirituous liquors is a right which every person in a community could exercise, if not restrained by penal enactments. The fifteenth section of the act granting licenses and regulating taverns, passed June 1st, 1831, prohibited by a forfeiture or penalty, recoverable by indictment, any person who is not duly licensed to keep a tavern, from following the business either of keeping a tavern or of retailing spirituous liquors. The same act authorizes a license to be granted to *16 certain persons to keep tavern, and prescribes the terms and regulations for granting the same for the period of one year.
It is insisted upon for the state, that the license authorized by this law, being simply a license to keep a tavern, did not carry with it the authority to retail spirituous liquors. In other words, that the licensed tavern-keeper was not licensed by the authority of law to retail spirituous liquors ; but was simply favored, by an exemption in the law, from the penalties imposed on the rest of the community for retailing spirituous liquors. It is the opinion of the majority of the court that this distinction is not warranted, and that, according to the true intent and meaning of the law of 1881, the license to keep a tavern carried with it and conferred the privilege of retailing spirituous liquors as clearly as if the same had been positively expressed.
The same act which imposed the restraint on the community at iarge authorized the license. The restraint was alike upon the business of keeping a tavern, as well as upon that of retailing spirituous liquors. And the license in fact conferred the authority to exercise all the acts prohibited by the penal provision of the law. It is apparent, from the context of the law and its evident reason and intent, that the license conferred the privilege of retailing spirituous liquors as clearly as that of keeping a tavern. Such has been the construction uniformly recognized, and such the common understanding in the execution of the law; and the privilege of retailing spirituous liquors has been an important consideration, and in many instances the only consideration for which the license has been obtained.
In construing a statute, words are to be taken in the sense in which they are ordinarily understood. The term tavern-keeper has for many years past been understood to import a person licensed to retail liquor at a house kept by him for public entertainment. Webster’s Dictionary defines a tavern to be “ a house licensed to sell liquors in small quantities *to be drank on the spot. In some of the United States, tavern is synonymous with inn or hotel, and denotes a house for the entertainment of travelers, as well as for the sale of liquors, licensed for that purpose.” A license to keep a tavern, therefore, in its ordinary signification, was understood to be a license to retail liquors and keep a house of entertainment. The amendatory act of February 25, 1833, authorizing a license to keep a tavern, without retailing liquor, requires a special exception *17 of the business of retailing liquor in the license. Without this exception, a license to keep a tavern conferred the authority to retail liquor as a material part of the privilege granted.
In the case of Curtis v. the State of Ohio, 5 Ohio, 199, the Supreme Court of this state was equally divided on the question whether a public house of entertainment in which no liquor was kepit was a tavern at all, in the meaning of the law, so as to be required in any instance to obtain a license. This division of the court led to the passage of the explanatory act of February 24, 1834, which expressly declares that no person, except persons who may reside in cities, towns, and villages, or within one mile thereof, shall be deemed or taken to be a keeper of a tavern, in the true intent and meaning of the aforesaid fifteenth section of the act of June, 1831, who does not keep spirituous liquors for sale in his house of entertainment.
It was clearly the intention of the act of 1831, that the authority to retail liquor should be conferred by the license to keep a tavern and constitute a material consideration in procuring it.
If the plaintiff in error, therefore, had the license to retail spirituous liquors, granted to him under the authority of law, as he alleged, did the act to restrain the sale of spirituous liquors, passed in 1851, revoke or annul it, so far as it conferred this privilege? The repealing clause of the act is in these words: “All laws, or parts of laws, licensing the sale of spirituous liquors, which are inconsistent with the provisions of this act, be and the same are hereby repealed.” ^This repealing clause affects nothing but the power to grant licenses in future after the law took effect. It repealed the authority, in the law of 1831, to grant any more licenses to retail spirituous liquors, but nothing further. There is no language employed expressive of any intention to revoke or annul the unexpired licenses previously granted under it. The license was a privilege, an acquired right, which, during its term, was not dependent on the continuance of the law under which it had been granted. If a license had been granted and taken out to keep a tavern under the act of 1831, on one day, and the next day the entire law had been repealed, it could not be claimed that the license to keep a tayern was revoked. The repeal of the law would simply take away the authority to grant future licenses. It is clear, that the unexpired licenses were not expressly repealed or revoked by the act of 1851. And it is but fair to presume, that if the gon *18 eral assembly had intended any such thing, such intention would have been expressed, and provision made for refunding the money obtained for the licenses revoked.
It is well-settled that several acts in pari materia, and relating to the same subject, are to be taken and comprised together in construing them; because they are considered as having an object in view, and as acting upon one system (Rex v. Laxdall, 1 Burr. 447). Chancellor Kent says : 11 The object of the rule is to ascertain and carry into effect the intention; and it is to be inferred that a code of statutes relating to one subject, was governed by one spirit and policy, and was intended to be consistent and harmonious.” 1 Eont’s Com., 463.
The case of Dodge v. Gridley, 10 Ohio, 177, appears to bear a strong analogy in principle. Certain rights had been acquired under the act regulating estrays, passed in 1831, by which persons living out of the limits of towns or villages were entitled to have their animals running at large exempted from liability to be taken up and dealt with under the authority of the town corporations. And the charter* of *the town of Harmar, passed in 1837, conferred full power and authority upon the town council to prevent any description of animals from running at large in the streets, etc.; and it was claimed that, being subsequent in date to the estray act, it repealed the latter so far as it extended to that town.
The court in this case say: “Eepeals by implication are not favored. "When two affirmative statutes exist, one is not to be construed to repeal the other by implication, unless they can be reconciled by no mode of interpretation. If they admit of being -applied to different subjects, there is no necessity of supposing an implied repeal.” There are many cases illustrative of this principle, especially that reported in 9 Cowen, 437. The statute of wills in New York prohibits a devise to a corporation. A subsequent •act incorporating the orphan asylum society declares that they may purchase real estate. The court held that the statute of wills was not repealed by the act of incorporation; for, although the word purchase, in its most extensive signification, includes a devise, yet, ■inasmuch as the right claimed is by the statute of wills expressly denied, it would seem to be more congenial to the spirit of both ■acts, to understand the word purchase in a restricted sense, and as ■so intended by the legislature.
*19 The court is not disposed to question the power of the legislature in a matter of this kind, connected as it is with the public policy and domestic regulations of the state. Upon the ground of protecting the health, morals, and good order'of community, we are not prepared to say that the legislature does not po'ssess the power to revoke such license. But where there has been no forfeiture of the license by abuse or violation of its terms, common honesty would require that the money obtained for it should be refunded in ease of its revocation.
The act of March 12, 1851, did not, by its terms, take effect till the 1st of May of that year, up to which period licenses could have been granted under the law of 1831. It is not reasonable to presume that the legislature would, *after authorizing a license, and allowing the granting of it till a particular period, and after obtaining thereby the payment of many thousands of dollars into the treasury, revoke the license before the expiration of the term for which it was granted, without reimbursement. At least the court will not presume any such act of bad faith, from mere implication. If any such power be exercised, it must be clearly and distinctly expressed in the law.
It is said that the policy of the act of 1851 was to put an end to all retailing of ardent spirits. But this does not affect the question. The licenses were but temporary, and of short duration ; and if not revoked, only gave the statute a more gradual effect in going into operation.
It is insisted, on the part of the state, that the language 6f the statute, which is general, providing, “ that if any person shall sell, etc., each and every person so offending shall be deemed guilty of a misdemeanor, etc., gives it a peculiar effect. This, however, is nothing more than the ordinary language employed in almost all penal enactments. The mere letter of the law is not always to be adhered to. It is well settled that penal statutes must receive a strict interpretation, and must not be extended in their operation bejmnd the manifest intention of the legislature. The subject-matter and the reason and effect of a law must be looked to in giving it a construction ; and where words, if taken literally, bear an absurd and unreasonable signification, there may be some deviation from the ordinary sense. The Bolognian law, mentioned by Puffondorf, which enacted that whoever drew blood in the street should be punished with the utmost severity, was held not to extend to *20 the surgeon who opened the vein of a person who fell down in the street with a fit. The authorities are numerous settling the principle that statutes in derogation of the rights either of the public or of individuals are not to be enforced by a strict adherence to their letter; but must be so construed that no man who is innocent be punished or damaged ; and no statute should be so construed as to render it unreasonable *or iniquitous in its operation. Bacon Ab. title Statutes, 1, 9, 10 ; 2 Bos. & Pul, 496 ; Sprague v. Birdsall, 2 Cowen, 419.
This ground of defense to the indictment would have been competent and more properly introduced under the plea of not guilty. Such special matter of exemption can not be regularly set up by special plea. 1 Saunders, 309; 1 Chittv’s Cr. Law, 473. But the state having waived the irregularity by demurring to the plea, it is the opinion of a majority of this court that the Common Pleas erred in sustaining the demurrer.
The second assignment of error noticed is that the Common Pleas proceeded to judgment and passed sentence without a plea of guilty or a finding by a jury. VYe are unanimous in the opinion that in this particular the Common Pleas erred. After sustaining the demurrer to the special plea, the judgment of the court should have been respondeat ouster. In a-criminal case in this state a defendant can not waive a jury trial in any other way than by a plea of guilty. And a plea of special -matter set up by way of avoidance found insufficient could in no instance be treated as such an admission of the legal quality of the guilt deducible from the indictment as to answer the purpose of a plea of guilty.
It may be important to notice the question of -the sufficiency of the indictment, for the purpose of settling a rule of pleading in regard to which the authorities are not clear and somewhat conflicting. This question -is now relied on by the plaintiff -in error, although not raised in the Common Pleas.
It is claimed that the indictment is defective on the ground that it does not contain a negative averment that the sale of spirituous liquor charged was not for medicinal or pharmaceutical purposes. The penal offense is described or defined in the first section of the act of 1851, and at the close of the section is a proviso in these words: “Provided that nothing contained in this section shall be so construed as to make it unlawful to sell any spirituous liquors for iiiedicina-1 and pharmaceutical purposes.”
*21 *The rule laid down iu the authorities on this subject is generally defined in this manner: that when a criminal or penal statute contains an exception in the enacting clause, that exception must bo negatived in the indictment; but where the statute contains provisos and exceptions in distinct clauses, it is not necessary to allege that the defendant does not come within the exceptions nor to negative the provisos. 1 Chitty’s Crim. Law, 284. In some of the authorities the negative allegation is made to depend ujDon the place in the statute where it occurs, 1 Term B., 141; in others upon the question whether the exception or proviso qualifies the description of the offense. In some, the rule is made to depend upon whether the exception be a matter of description in the negative, the affirmative of which would be a good excuse for the defendant, 2 Hawk. 255, 112; while in others it is made to depend upon the distinction between a proviso in the description of the offense and a subsequent exemption from the penalty under certain circumstances. This is Lord Mansfield’s rule in Spiers v. Parker, 1 Term R., 86, 87.
The confusion which seems to exist in regard to this rule has arisen from the various modes adopted and the indefinite language used in defining it, and the multiplicity of forms in which exceptions, qualifications, and exemptions are introduced into statutes. "What constitutes the enacting clause in the meaning of some of the authorities is not clear. A clause is a distinct member or subdivision of a sentence, in which the words are inseparably connected with each other in sense, and can not, with propriety, be separated by a point; yet very frequently the language creating and describing the offense and fixing the penalty includes several distinct clauses and sometimes a whole section.
It is requisite that every indictment should contain a substantial description of all the circumstances descriptive of the offense as defined in the statute, so as to bring the defendant precisely within it. And the only substantial reason for requiring this negative averment at all is that, without it, the description of the offense would not be ^complete. When, therefore, the matter of the proviso or exception in the statute, whether it be embraced within what lias been termed the enacting clause or not, enters into and becomes a part of the description of the offense, or a material qualification of the language which defines or creates the offense, the negative allegation in the indictment is requisite. But where it is *22 a subsequent exemption, or occurs in a separate and distinct clause or part of the statute,, disconnected with the statutory description of the offense, the negative averment is unnecessary.
In the case before the court, the matter of the proviso in the first section of the act of 1851, points directly to the character of the offense, is in the same sentence with it, and made a material qualification in the statutory description of it.
It is the opinion of the majority of the court that the indictment should have contained the negative averment, that the sale of the liquor was not for medicinal or pharmaceutical purposes, and is, therefore, defective.
The judgment of the Court of Common Pleas is reversed.
Thurman, J., having been of counsel for the plaintiff in error, did not sit in this case.
Banney, J., dissented from the opinion of the court as to the sufficiency^ the ground of defense set up in the special plea, but concurred in the reversal of the judgment on the other grounds.
Corwin, J., dissented from the opinion of the court as to the sufficiency of the indictment, hut concurred in the decision on the other points.